[Cite as *State v. Jury*, 2016-Ohio-2663.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                        Court of Appeals No. E-14-100

     Appellee                                  Trial Court No. 2013-CR-472

v.

Brian Jury                                          **DECISION AND JUDGMENT**

     Appellant                                 Decided:   April 22, 2016

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Mary Ann Barylski, Assistant Prosecuting Attorney, for appellee.

Joanna M. Orth, for appellant.

* * * *

**PIETRYKOWSKI, J.**

{¶ 1} Defendant-appellant, Brian Jury, appeals the August 7, 2014 judgment of the

Erie County Court of Common Pleas which, following a jury trial convicting him of two

counts of rape, one count of felonious assault, and two counts of abduction, with three

gun specifications, sentenced him to a total of 36 years of imprisonment.  For the reasons set forth herein, we affirm.

{¶ 2} On November 14, 2013, appellant was indicted on nine counts including two counts of kidnapping, attempted murder, felonious assault, and five counts of rape. Seven of the counts had firearm specifications.  The charges stemmed from the November 1, 2013 alleged abduction and rape of the victim in Erie County, Ohio. Appellant entered not guilty pleas to the charges.

{¶ 3} An eight-day jury trial commenced on June 17, 2014, and the evidence is summarized as follows.  On November 1, 2013, at approximately 2:00 p.m., a motorist testified that she was travelling westbound on Strecker Road, in Erie County, Ohio, when she observed a nude female bound and gagged and sitting along the side of the road.  The motorist stated that the victim had tightly bound zip ties on her ankles and hands which were purple and that she was cold.  She described the victim's mental state as "terror." The motorist called 911.

{¶ 4} The motorist testified that she flagged down a passing vehicle; the driver happened to be an off-duty Erie County sheriff's deputy.  Deputy Steve Hammersmith testified that when he approached the victim he observed and she was very uncomfortable; he took off his T-shirt and slid it down over her arms which were still bound.  Hammersmith stated that he removed the heavy tape covering the victim's mouth which also pulled out some of her hair.  Deputy Hammersmith stated that the zip ties around her hands and feet were "embedded" in her skin approximately a quarter inch.

2.

**{¶ 5}** Deputy Hammersmith questioned the victim and discovered that she came from a camper near the roadway. The victim stated that the perpetrator could still be on the premises and that he was armed. Hammersmith stated that he telephoned dispatch with the additional information. Another passing motorist provided a pair of scissors to remove the zip ties and a neighbor brought out a blanket to cover the victim. Eventually, she was transported by ambulance to the hospital.

**{¶ 6}** Emergency physician, John Smith, testified that he conducted the initial examination of the victim. Reviewing her chart, Dr. Smith indicated that her chief complaint was that she was raped five to six times. The victim also complained of pain to her wrist, ankle and back. The victim indicated that she had fallen out of a trailer and rolled up a hill. Dr. Smith indicated that the victim's injuries were consistent with being tied up. Dr. Smith further stated that it was a "slam dunk" as far as his belief that the victim had been raped. An objection to the testimony was raised and the court gave a curative instruction. A mistrial based on Dr. Smith's testimony was later requested and denied.

**{¶ 7}** Dr. Smith clarified that the victim's injuries were consistent with being raped but that he did not conduct the rape exam; he ordered it and it was done by a Sexual Assault Nurse Examiner ("SANE"). Dr. Smith noted that the victim denied drug or alcohol use.

3.

{¶ 8} SANE Julie Young testified that she was called to conduct a rape kit or rape exam on the victim. Young stated that she received a narrative statement from the victim. According to Young, the victim stated that appellant, whom she had met before, was driving by and offered her a ride to the store. Appellant did not stop at the store and had a gun and threatened to shoot her. The victim stated that appellant drove her to a camper, removed her clothing and raped her. Appellant used zip ties to restrain her. Once he left, the victim stated that she rolled out the door and up on to the road where she was found.

{¶ 9} Young testified that she photographed the victim's injuries; the photos were published to the jury and depicted ligature marks on her wrists and ankles, various abrasions, and cellular injury to the victim's vagina (such injury could have occurred during "rough" consensual sex.) Oral, vaginal, and anal swabs were collected as well as hair samples and fingernail scrapings. The kit was transferred to Deputy Daniel Ozech of the Erie County sheriff's department. During cross-examination, Young agreed that she questioned the victim about her drug and alcohol use and that the victim denied using "recreational drugs."

{¶ 10} Lorain Detective Christopher Kovach, testified that his department was contacted regarding a possible kidnapping case involving appellant. According to Detective Kovach, appellant owned various properties in Lorain and his girlfriend lived there. Driving by her home, appellant's work truck appeared to be in the driveway. Zip ties matching the description of those removed from the victim were seized from the

4.

truck. A Motorola cell phone was also taken from the console of the truck. Speaking with his girlfriend, police were notified that his motorcycle was not in the garage and that he may be driving it.

{¶ 11} James Wolford, a city of Lorain patrol officer, testified that on November 1, 2013, at approximately 6:15 p.m., and after being informed of the allegations against appellant and his possible location, he observed appellant riding his motorcycle and initiated a stop. Wolford stated that appellant had a loaded .22 caliber pistol in his breast pocket and a loaded 9 millimeter semi-automatic handgun in his jacket pocket. A knife was found in the saddlebag of the motorcycle and one was found on his person. DNA swabs were taken from appellant.

{¶ 12} Erie County Detective Sergeant Dennis Papineau testified that he acted as a blind administrator of a photo array presented to the victim. In other words, Papineau did not know who the suspect was or even if he was included in the array. Detective Papineau testified that he showed the victim the photo array and that she identified appellant.

{¶ 13} Detective Papineau testified that he then briefly interviewed the victim and photographed her injuries which included scrapes and dirt around her knees and marks on her ankles and wrists. Papineau stated that she was visibly upset.

{¶ 14} Papineau testified that a search warrant was executed for the camper and several items were confiscated including "tie straps," tissues, and multiple types of duct tape. Papineau also obtained search warrants for the appellant's iPhone records through

5.

Verizon and the victim's Motorola phone. Detective Papineau stated that there were several text messages between the two phones; those messages, spanning October 30, 2013, to November 1, 2013, were consolidated in an exhibit and admitted into evidence. The gist of the messages was that the victim was inquiring about renting a property in Lorain from appellant. The victim was having trouble locating the house; appellant offered to pick up the victim and show her the house. On November 1, 2013, beginning at 10:37 a.m., the following exchange took place. Appellant to the victim: "Where at." The victim to appellant: "On 18." Appellant to the victim: "Let's go." The victim to appellant: "Putting shoes on now." Thereafter, at 2:54 p.m., from appellant to the victim: "Hope you liked the house, let me know if you're interested."

{¶ 15} Detective Papineau was cross-examined about the texting history between appellant and the victim and her reluctance to acknowledge that she knew him prior to the events of November 1. Papineau stated that the earliest text the records showed was from March 1, 2013. Further, the victim's cell number was stored in appellant's phone and a missed call from her number was placed in July 10, 2013.

{¶ 16} Detective Papineau was questioned regarding a second interview with the victim which he conducted after he had the above information. Detective Papineau admitted that he did not inquire about the fact that in prior interviews, the victim failed to mention that she knew appellant. Further, he did not ask for an explanation of the discrepancy in where the victim was picked up. She stated that she was picked up on 19th Street in Lorain, Ohio, but the text message stated that she was putting on her shoes

6.

on 18th Street. The victim did admit that there were prior text messages and that she had spoken with appellant about renting a house.

{¶ 17} Erie County sheriff's deputy Jared Oliver testified that when he arrived on the scene, Deputy Hammersmith and the motorist were assisting the victim. Additional officers and emergency response arrived shortly thereafter. Oliver stated that they searched the camper and the property. Deputy Oliver stated that they ascertained the suspect's identity from the VIN of a truck on the property and mail in the mail box. At that point they also linked appellant to a Lorain County address and informed police in that jurisdiction of the investigation. Deputy Oliver further testified that the victim informed him that appellant had been in a white work truck; neighbors stated that he worked for a gas company. At that point, Deputy Oliver found an Airgas statement in the camper and deduced that appellant worked for that company. Through Airgas, they acquired appellant's cell phone number. Deputy Oliver testified that he called appellant's cell phone and left a message in order to get a GPS coordinate; the coordinate indicated that the phone was in Lorain County.

{¶ 18} Deputy Oliver testified that a few months into the investigation he learned that the victim had ingested heroin the day before the incident; he was also aware of her use of Oxycodone and Percocet. Oliver stated that the victim's drug use did not change either the way the crime was investigated or her status as a crime victim.

7.

{¶ 19} Deputy Oliver testified regarding several photographs taken at the scene including photos of a tarp laid out on the ground near the camper. Oliver stated that the grass underneath the tarp was "fresh" so it had not been there long.

{¶ 20} Deputy Oliver was cross-examined about the victim's version of the events. Specifically, the fact that she initially denied drug use and downplayed her prior contacts with appellant.

{¶ 21} Lorain Police Detective Steyven Curry testified that he interviewed the victim at the hospital. The audiotape of the interview was played for the jury. Curry was cross-examined about the victim's version of the events including the fact that her story made it look like appellant picking her up to give her a ride to the store was a random event and that they had not been in recent contact. The victim failed to mention she had been exchanging text messages with appellant that morning about looking at a house for rent. Detective Curry was also questioned about the fact that the victim was introduced to appellant through a mutual friend who was a heroin addict and prostitute.

{¶ 22} The victim testified that she first met appellant in 2012, and was introduced by their mutual friend K.A. At the time, the victim knew appellant as "Greg." Around that time he showed her an apartment. In October 2013, the victim stated she contacted appellant about renting a house. She had telephone and text contact with him in the days leading up to November 1, 2013. The victim testified that she and her boyfriend unsuccessfully attempted to locate the house; appellant agreed to show it to her the next day.

8.

{¶ 23} The victim testified that the next day she walked one street over to see if a friend had moved from her residence yet; the friend was gone so the victim decided to walk to the store. The victim testified that appellant pulled up and offered to drive her to the store; she agreed and got in the truck. The victim stated that appellant did not stop at the store and when she asked where they were going he said to "shut the f*ck up," that he had a gun, and not to move.

{¶ 24} Once in Erie County, the victim stated that he stopped and took her into a camper. He was carrying a gun. Once inside, the victim testified that appellant took off her clothing and threatened to shoot her if she did not comply. Appellant then placed a knife to her throat and began raping her. The victim stated that he eventually used zip ties to restrain her arms and legs. Her mouth was duct-taped shut.

{¶ 25} The victim testified that appellant raped her five times and that in between he went outside for approximately 15 to 20 minutes. The victim could not see what he was doing but stated that it sounded like he was moving vehicles around. Appellant eventually left; he took the victim's cell phone.

{¶ 26} At that time, appellant stated that she rolled off the bed and used her head to move a suitcase and to open the door. Appellant then rolled out of the camper and fell to the ground. Appellant stated that she rolled in the rocks and up to the highway where a passing motorist spotted her and stopped. An off-duty sheriff's deputy also stopped.

{¶ 27} The victim denied that any of the treating medical personnel asked about her drug usage. She admitted that she did not tell them, but stated that she was

9.

traumatized from the events.  Appellant testified that Greg (appellant) was the perpetrator and denied that they had a prior sexual relationship.

{¶ 28} During cross examination, the victim stated that she met K.A. approximately two and one-half years ago and appellant two years ago. The victim also admitted that appellant was at her home two months prior to the incident.  The victim stated that her boyfriend did not like appellant and he did not want him to know where they lived so that is why she met him on the next street.  The victim indicated that they recently moved to a neighboring house and appellant had not been there.

{¶ 29} The victim was then questioned about a series of text messages on the morning of the incident.  At 9:51 a.m., she texted appellant that she could not find the house he had available for rent.  At 10:26 a.m., appellant asked if the victim wanted him to pick her up to show her; she responded yes.  It was determined that they would meet immediately.  She texted him to meet her on 18th Street, and she testified that she told him she was putting on her shoes to allow time for her to get to the store. The victim stated that she was surprised that he arrived so quickly.  The last text message was sent from appellant to the victim at 2:54 p.m. that day and read: "Hope you liked the house. Let me know if you're interested."   The victim stated that at that time she had been found bound on the side of the road.

{¶ 30} Other than the two times she was looking for housing, the victim denied having any other contact with appellant.  When confronted with the cell records which

showed several additional contacts, she stated that K.A. had used her phone because she did not have one.

{¶ 31} Forensic scientists testified regarding the chain-of-custody and testing done on biological materials taken from the rape kit contents, appellant, and swabs from various other pieces of evidence. The reports, that were testified to and admitted into evidence, showed that the DNA from the vaginal swabs came from the victim and appellant. Further, the victim could not be excluded as a contributor to the DNA found from the swab of the knife blade. The statistical likelihood was one in 5,271 unrelated individuals.

{¶ 32} Following the presentation of the state's evidence, appellant's counsel moved for a directed verdict on the attempted murder charge arguing that the evidence failed to show that appellant have a specific intent or purpose to cause the victim's death. The court denied the motion.

{¶ 33} Appellant presented evidence in support of his case. An employee for Airgas testified that she coordinates jobs with technicians, including appellant who had worked for the company since 2011. She testified that on November 1, 2013, at 10:40 a.m., she emailed appellant about a service call in Elyria, Ohio. She was informed that he arrived there at approximately 12:30 pm., or around lunchtime.

{¶ 34} During cross-examination, the Airgas employee said she verified the timing through a driver who saw appellant there and another technician. She was then

11.

questioned about another Airgas employee whose log indicated that appellant arrived at 2:30 p.m.; she clarified that she got the information from her "liaison" at the company and not from personal knowledge.

{¶ 35} Toxicologist Robert Forney testified regarding the results of the victim's urine drug screen taken upon arrival at the hospital. The results were positive for various controlled substances, including heroin, and alcohol. Regarding the victim's heroin use, Fortney testified that based on the level detected it would have been "recent," or within the preceding 12 hours.

{¶ 36} Appellant testified that he met the victim in March 2013, and paid her for sex. Appellant stated that he paid her for sex several more times. Appellant stated that they had intercourse at least ten times at her house and then various times at his rental properties for a total of approximately 20 times from September to November 2013.

{¶ 37} Appellant testified that on the morning of November 1, 2013, he had slept at his fiancée's house in Lorain. At approximately 10:00 a.m., appellant testified that the victim texted that she wanted to see the property he had for rent. Appellant stated that he was in his work vehicle and was about to head out to his farm to get parts for a job he had that day. The victim's texts indicated that she was at her home on 18th Street in Lorain. Appellant stated that he waited in front of her house, she came out and they headed over to the property. Appellant stated that they did not go in the property because he could not find the key. Appellant believed that his set of keys was with a maintenance worker.

12.

{¶ 38} Appellant testified that the victim wanted to exchange rent for sex but that he declined. Appellant did agree to have sex with the victim for money; he stated that she informed him that they could not go back to her house because her brother (actually her boyfriend) was there. Appellant suggested that the victim ride with him to his farm, and that he would drop her off on the way to his job.

{¶ 39} When they arrived at the camper, appellant said that it was cold so he gave the victim a blanket and went out to get the parts for his job. Appellant stated that it had recently rained on some tarps that were covering a picnic table and some tools; the tarps were wet so he laid them on the ground to dry out.

{¶ 40} When he returned to the camper, the victim began performing oral sex. Appellant stated that they had vaginal intercourse and that he ejaculated in her. Once the sex acts were completed and the victim was back in his truck, he opened his wallet to pay her the agreed upon $40. At that point, appellant stated that he discovered that $100 was missing; he confronted the victim who denied taking it. Appellant testified that he made the victim remove her clothing and the $100 fell out of her bra. Appellant stated that at that point, the victim said she wanted $1,000 or she would accuse him of rape.

{¶ 41} Appellant testified that it "escalated" from there and that the victim was screaming and calling him names. He testified that he grabbed the victim's wrists behind her back and put her face-down on a bench. Appellant then grabbed zip ties and secured her wrists; he stated that he tied her feet together because she was kicking him. Because she could still maneuver, appellant hogtied or bound her wrists and ankles together.

13.

Appellant stated that she still would not be quiet so he put paper towels in her mouth and duct taped it shut. Appellant then stated that he told her they both needed a "break" and said he would be back in a few hours. Appellant stated that he left at approximately 11:30 to 11:40 a.m.

{¶ 42} Appellant stated that he arrived at his service call in Elyria, Ohio, between 12:30 and 1:00 p.m. Regarding the testimony that he arrived after 2:30 p.m., appellant stated that drivers may put down technically incorrect times based on "stop pay" restrictions. Appellant testified that he finished the job around 2:45 p.m. At that time, he listened to two voicemails from the Erie County Sheriff's Office; the first one stated that police needed to speak with him, listening to the second one he could hear his dog barking so he knew they were at his property. Appellant testified that he panicked and sent a text to the victim's phone stating that he hoped she liked the house and to let him know if she was interested. He stated that he sent it to create an "alibi" or to make it appear that he was not with the victim. Appellant stated that he took his work truck back to his fiancée's house, retrieved two guns and two knives and drove towards the farm on his motorcycle. Approaching his property in Erie County, he observed a sheriff's vehicle in the road; appellant stated that he turned around and ultimately began driving toward his attorney's office when he was stopped and arrested by Lorain police.

{¶ 43} During cross-examination, appellant was questioned about his 2:54 p.m. text message he sent to the victim which he stated was in response to the police voicemails, not based upon his intent to kill her and use the text as an alibi. Appellant

14.

was then confronted with his phone records showing that the calls from the deputy were at 3:22 p.m. and 3:24 p.m., which was after he sent the text.

{¶ 44} Appellant agreed that he laid a tarp out "several feet" from the camper where the victim was located. Appellant agreed that he restrained the victim's liberty and did not free her in a safe place. Appellant denied taking the victim's cell phone. He denied raping the victim.

{¶ 45} K.A. testified that she is a heroin addict and a prostitute and that she has had sex with appellant on a few occasions. K.A. stated that she knew the victim from "prostituting" and they had met at a drug dealer's house. K.A. denied ever using the victim's phone to contact appellant.

{¶ 46} Appellant's final witness was a former co-worker who testified that appellant was a "truthful" person. When cross-examined, he stated that he did not know that appellant carried guns and paid prostitutes for sex.

{¶ 47} Following deliberations, the jury found appellant not guilty of attempted murder, guilty of two counts of rape and not guilty of three counts of rape, guilty of felonious assault, guilty of two counts of abduction, a lesser included of kidnapping. The jury further found appellant guilty of gun specifications as to three of the counts. Appellant was sentenced on August 7, 2014, and this appeal followed.

{¶ 48} Appellant now raises six assignments of error for our review:

First Assignment of Error: The verdict is against the manifest weight of the evidence.

Second Assignment of Error: The trial court erred when it failed to give a lesser included charge of sexual battery.

Third Assignment of Error: The trial court erred in denying defendant/appellant's motion for mistrial insofar as the prejudice created by the testimonial evidence of the expert witness outweighed its probative value.

Fourth Assignment of Error: The testimony of [the victim] was wrongfully bolstered by inadmissible hearsay statements.

Fifth Assignment of Error: Defendant/appellant's sentence should be vacated as the trial court failed, as a matter of law, to make specific findings of fact before imposing consecutive sentences pursuant to Ohio Revised Code § 2929.14(C)(4).

Sixth Assignment of Error: Defendant/appellant's sentence should be vacated as it is excessive, unreasonable and contrary to law.

{¶ 49} In his first assignment or error, appellant argues that the jury's verdict was against the manifest weight of the evidence. An appellate court in considering a challenge to a verdict on the grounds that it is against the manifest weight of the evidence acts as a "thirteenth juror," reviews the entire record, weighs the evidence, and may disagree with the factfinder's conclusions on conflicting testimony. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

16.

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered." *Id.,* quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st. Dist.1983).

{¶ 50} There is a presumption that the findings of the trier-of-fact are correct. *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. Reversals on the ground that a verdict is against the manifest weight of the evidence are granted "only in the exceptional case in which the evidence weighs heavily against conviction." *Thompkins* at 387.

{¶ 51} Appellant's argument that the verdict was against the weight of the evidence centers on the victim's testimony. Specifically, appellant points to inconsistencies regarding the victim's prior contacts with appellant, her drug use and alleged prostitution. Carefully reviewing the trial testimony, we find that appellant's admission to restraining the victim and the testimony from police and emergency medical personnel as to the victim's injuries and demeanor, demonstrate that they jury did not

17.

lose its way in convicting appellant of rape, felonious assault, and abduction. Appellant's first assignment of error is not well-taken.

{¶ 52} Appellant's second assignment of error asserts error in the trial court's failure to instruct the jury on the lesser included offense of sexual battery. The state counters and the record confirms that appellant failed to request a sexual battery instruction and did not object to the instructions given.

{¶ 53} As noted by the state, Crim.R. 30(A) provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.

On appeal, *a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to*

*consider its verdict*, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury. (Emphasis added.)

{¶ 54} The failure to object to a jury instruction constitutes a waiver of any claim of error to the instruction. *State v. Long* , 53 Ohio St.2d 91, 96-97, 372 N.E.2d 804 (1978). Crim.R. 52(B) provides a means to avoid waiver under plain error. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus; *State v. Witcher,* 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960, ¶ 32.

{¶ 55} In the present case, the parties and the court reviewed the jury instructions in great detail. Prior to trial, appellant filed a motion requesting that the jury be instructed on the lesser included offense of abduction; the request was granted. Appellant's theory at trial was that the sex acts between he and the victim were consensual. Thus, it is likely that counsel's failure to request a sexual battery jury instruction was tactical in nature and the court did not commit plain error in failing to give the instruction. *See State v. Viers*, 7th Dist. Jefferson No. 01 JE 19, 2003-Ohio-3483 (rejecting the argument that the trial court should have sua sponte instructed on the lesser included offense undermining counsel's trial strategy). Appellant's second assignment of error is not well-taken.

19.

{¶ 56} Appellant's third assignment of error contends that the trial court erred when it denied his motion for a mistrial based on the testimony of emergency room physician John Smith. In general, the grant or denial of a mistrial rests within the discretion of the trial court and is subject to review on appeal under an abuse of discretion standard. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987), *Long*, 53 Ohio St.2d at 98, 372 N.E.2d 804. A mistrial is an extreme remedy and should be "declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin,* 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville,* 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

{¶ 57} During Dr. Smith's direct examination, the following discussion took place:

Q: Okay. Have there been times that you've determined, from a medical standpoint, that some of their claims are not consistent with your examination.

A: Yes. I mean, some people you'll see, you'll get your history and physical, and it sounds sort of crass, but I'll say, I don't really believe this person was raped –

MR. BRADLEY: Objection.

A: -- or anything happened –

COURT: Basis?

A: -- to them.

20.

COURT: Basis?

MR. BRADLEY: It has nothing to do with this case, Your Honor.

MR. BAXTER: I – I think it gives –

COURT: You're saying relevant, not relevant?

MR. BRADLEY: Not relevant, Your Honor.

MR. BAXTER:  I think it –

COURT: Overruled.  Overruled.  Answer the question.

MR. BAXTER: It goes to his expertise.

COURT: Overruled.  Answer the question.

A: Okay.  And on this case this was about as big a slam dunk as far as somebody --.

MR. BRADLEY: Objection.

A: -- that I thought was raped and –

COURT: Basis?

A: Was tied up.

MR. BRADLEY: Objection.

{¶ 58} The trial court immediately sustained the objection to Dr. Smith's testimony and, following a bench discussion, instructed the jury as follows:

[A]n expert can testify as to their own field and their reasonable degree of medical certainty for this doctor's field, but the determination whether this offense took place, whether rape actually took place, that

determination is made by you, the jury.  So any comment by the doctor that the rape actually took place does not replace your obligation or your duty to determine that.  He's only talking in the medical profession.  Any reference that was made that you took otherwise you're to disregard.

{¶ 59} Dr. Smith then clarified that his final "diagnosis" was an order for a rape exam to be conducted by a SANE.  He based the order on the victim's injuries and mental state which, he testified, were consistent with her claim that she was raped.

{¶ 60} A curative instruction to disregard testimony has been recognized as "an appropriate remedy, rather than a mistrial, for inadvertent answers given by a witness to an otherwise innocent question." *State v. Holmes,* 5th Dist. Stark No. 2004CA00118, 2005-Ohio-1481, ¶ 52; *see State v. Mobley*, 2d Dist. Montgomery No. 18878, 2002 WL 506626 (Apr. 5, 2002). A jury is presumed to follow such an instruction.  *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).

{¶ 61} Reviewing Dr. Smith's entire trial testimony and the court's curative instruction, we find that the court did not abuse its discretion when it denied appellant's motion for a mistrial.  Appellant's third assignment of error is not well-taken.

{¶ 62} In his fourth assignment of error, appellant argues that the victim's testimony was "wrongfully bolstered" by inadmissible hearsay statements.  Specifically, appellant contends that during the testimony of Detective Curry, the court, over objection, wrongfully allowed the audio-taped interview of the victim to be played for the jury.

22.

**{¶ 63}** Initially we note that questions regarding the admissibility of evidence are left to the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.

**{¶ 64}** The court based its decision on Evid.R. 801(D)(1) which provides:

> (D) Statements Which Are Not Hearsay. A statement is not hearsay if:

> (1) *Prior Statement by Witness*. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is (a) inconsistent with declarant's testimony, and was given under oath subject to cross-examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification.

**{¶ 65}** The rule "'permits the rehabilitation of a witness whose credibility has been attacked by an express or implied charge that he recently fabricated his story or falsified his testimony in response to improper motivation or undue influence.'" *State v. English*, 12th Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 35, quoting *State v. Brown*,

23.

12th Dist. Butler No. CA2011-11-207, 2013-Ohio-1610, ¶ 16. Further, "'[i]n determining whether to admit a prior consistent statement, a trial court should take a generous view of the entire trial setting to determine if there was sufficient impeachment to amount to a charge of fabrication or improper influence or motivation.'" *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 14 (1st Dist.), quoting *State v. Jones*, 1st Dist. Hamilton No. C-080518, 2009-Ohio-4190, ¶ 35.

{¶ 66} In the present case, defense counsel claimed that the motive to lie arose immediately following the incident because the victim threatened to lie about the rape if appellant did not pay her $1,000. However, during opening arguments and in attacking the victim's credibility, defense counsel repeatedly stated that the victim lied because she did not want police to know that she was a prostitute and a heroin addict. Counsel labeled her a thief and attempted to use her recent heroin use to attack her memory and credibility. Counsel further stressed that the victim changed her story several times between her first statements at the scene and subsequent interviews.

{¶ 67} Following the playing of the taped interview, Detective Curry was thoroughly cross-examined about the discrepancies in the victim's statement and subsequent facts. Specifically, Curry admitted that it was interesting that the victim made it appear that her initial encounter with appellant was random rather than a premediated meeting to look at a property.

24.

{¶ 68} Based on the foregoing, we cannot say that the trial court abused its discretion when it allowed the audiotaped interview of the victim to be played for the jury. Appellant's fourth assignment of error is not well-taken.

{¶ 69} In appellant's fifth and sixth assignments of error, he argues that appellant's consecutive sentence was contrary to law and excessive because the court's R.C. 2929.14(C)(4) finding was erroneous. Specifically, appellant argues that the findings that the offenses were committed as part of a course of conduct, R.C.2929.14(C)(4)(b) and that appellant had a history of criminal conduct, R.C. 2929.14(C)(4)(c), were in error.

{¶ 70} We review consecutive sentences under the standard of review set forth in R.C. 2953.08. *State v. Banks,* 6th Dist. Lucas No L-13-1095, 2014-Ohio-1000, ¶ 10. Under R.C. 2953.08(G)(2), we may increase, reduce, or modify a sentence, or vacate the sentence and remand the matter to the sentencing court for resentencing, if we clearly and convincingly find that either the record does not support the trial court's findings under R.C. 2929.14(C)(4), or the sentence is otherwise contrary to law.

{¶ 71} R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of

25.

the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 72} In *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus, the Supreme Court of Ohio clarified the responsibilities of a trial court when imposing consecutive sentences: "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings."

26.

**{¶ 73}** The court further explained: "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

**{¶ 74}** At appellant's July 14, 2014 sentencing hearing the court found that consecutive sentences were necessary "to protect the public from future crimes and to punish you and that the consecutive sentences are not disproportionate to the seriousness of your conduct or the danger you pose." The court indicated that as to protecting the public "50 women in four years in the past and now more women, and the type of activity that you did here shows that you are a danger to the public."

**{¶ 75}** The court further found that the multiple offenses were part of a course of conduct and that the harm was so great or unusual that no single prison term would adequate reflect the seriousness of the conduct. The court then stated:

> I think that a bound, gagged, hogtied, naked female left in a trailer that you even talked about when the trailer, you got there, it was cold, that you gave her a blanket and that you had to warm up your own hands because it was so cold in there. Leaving her like that and for her to have to crawl out of it, roll up off the yard, up the stones, and onto the middle of a highway, or a road I should say, where the speed limit's 55, and lay there and hope, hope that you're not coming back to kill her, because, according to her version, you had told her that if she moved, your cell phone would go

off and you'd be right back. Just hope that somebody else would come by and save her. The Court finds that the conduct is outrageous, just outrageous for one human being to do that to another human being. So the seriousness or your conduct, one single penalty would not adequately reflect that.

Additionally, not only abduction, the rapes, and I've talked about the violent nature of the rapes, but also the zip ties and the gagging and putting the Kleenex in the mouth and everything else or tissue, if you will, in the mouth and then duct taping around that, all that, the Court finds that consecutive sentences are necessary.

{¶ 76} Based on the foregoing, and after a careful review of the record in this case, we conclude that the trial court properly found that the harm in this case was "great or unusual" in support of the imposition of a consecutive sentence. Thus, appellant's consecutive sentence was neither excessive nor contrary to law. Appellant's fifth and sixth assignments of error are not well-taken.

{¶ 77} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Erie County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.          _____
                                                    JUDGE

Arlene Singer, J.          

Stephen A. Yarbrough, J.          _____
CONCUR.                                          JUDGE

                                  _____
                                                    JUDGE